IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

TERRICK TERRELL NOONER,                                                    PLAINTIFF

     and

DON WILLIAMS DAVIS                                          INTERVENOR  PLAINTIFF

     and

JACK HAROLD, JONES, JR.                                     INTERVENOR PLAINTIFF

                         No. 5:06CV00110 SWW

VS.

LARRY NORRIS, Director,
Arkansas Department of Correction;
GAYLON LAY, Warden,
Arkansas Department of Correction;
WENDY KELLY, Deputy Director for
Health and Correctional Programs;
JOHN BYUS; Administrator, Correctional
Medical Services, Arkansas Department of Correction; and
OTHER UNKNOWN EMPLOYEES,
Arkansas Department of Correction                                          DEFENDANTS

## ORDER

      Before the Court are (1) Plaintiff Terrick Terrell Nooner's motion for a preliminary

injunction or stay of execution (docket entry #87),  Defendants' response in opposition (docket

entry #90), and Nooner's reply (docket entry #91) and (2) Plaintiff Jack Harold Jones's motion

for a preliminary injunction or stay of execution.  After careful consideration, and for reasons

that follow, Plaintiffs' motions will be denied.

### I. Background

      This § 1983 action was originally filed on May 1, 2006 by Arkansas death row inmate

Terrick Terrell Nooner ("Nooner") against Arkansas Department of Correction ("ADC")

officials in their official capacities.  In the complaint, Nooner claims that the ADC's lethal

injection protocol violates the Eighth Amendment because it presents an unnecessary risk of

extreme pain and because use of the protocol demonstrates deliberate indifference to condemned

inmates' health and safety.[1]

The following events have occurred since Nooner filed suit.  On May 4, 2006, death row

inmate Don William Davis ("Davis") filed a motion to intervene as a party plaintiff.  On May 11,

2006, Governor Mike Huckabee scheduled Davis's execution for July 5, 2006, and on May 26,

2006, the Court granted Davis's motion to intervene.   On June 26, 2006, the Court granted

Davis's motion for a stay of execution in order to permit him to litigate his challenge to the lethal

injection protocol.

On June 30, 2006, Defendants appealed the order granting Davis a stay of execution.  On

November 22, 2006, while the appeal was pending, death row inmate Jack Harold Jones filed a

motion to intervene as a party plaintiff, and the Court granted his motion on December 1, 2006.

During the pendency of Defendants' appeal, a period of  12 months, Nooner made no discovery

requests and took no steps toward prosecuting his claims.[2]

---

[1]The challenged protocol calls for the serial administration of  thiopental, pancuronium
bromide, and potassium chloride.  The crux of Nooner's claim is that unless thiopental is
correctly administered, he will suffer excruciating pain upon administration of potassium
chloride, and he will be unable to demonstrate his suffering because of the paralyzing effect of
pancuronium bromide.

[2]The Court has acknowledged that it neglected to enter a scheduling order in this case.
*See* docket entry #88 at 5.  However, lack of a scheduling order did not prevent counsel from
conferring and developing a discovery plan as required under Federal Rule of Civil Procedure
26(f);  nor did it prevent Nooner from requesting that the Court enter a scheduling order.  *See*
*Nickens v. White,* 622 F.2d 967, 971 (8th Cir. 1980)("We think that this requirement for diligent

On July 9, 2007, the Eighth Circuit issued an opinion vacating Davis's stay of execution on the ground that this Court applied the wrong standard in determining whether Davis had unnecessarily delayed bringing his claim.  *See Nooner v. Norris,* 491 F.3d 804 (8th Cir. 2007).

On July 11, 2007, Plaintiff Nooner filed a motion for expedited discovery, and on July 12, 2007, he served Defendants with discovery requests.

On July 17, 2007, Defendants filed a motion for summary judgment.  In support of their motion, Defendants submitted the declaration of Larry Norris, Director of the Arkansas Department of Correction ("ADC"), stating that the ADC amended its lethal injection protocol on July 16, 2007.  Defendants assert that the amended protocol[3] is substantively similar in all material respects to the Missouri protocol upheld in *Taylor v. Crawford*, 487 F.3d 1072 (8th Cir. 2007);  they are entitled to judgment as a matter of law; and no discovery is warranted or necessary.  On July 30, 2007, Plaintiffs filed a response in opposition to summary judgment.  Additionally, Nooner's counsel Julie Brain filed an affidavit pursuant to Federal Rule of Civil Procedure 56(f).

On July 31, 2007, Governor Beebe scheduled Nooner's execution for September 18, 2007, and on August 8, 2007, Nooner filed a motion for a stay of execution.

On August 9, 2007, the Court entered an order denying Nooner's motion for expedited discovery.  Additionally, the Court consolidated with this case a separate case filed by Arkansas death row inmate Frank Williams challenging Arkansas's lethal injection protocol.

---

discovery applies with the same force in lawsuits brought by prisoners once counsel has appeared, as in other lawsuits.)

[3]Defendants submit a copy of the amended protocol as an exhibit to Norris's declaration. Docket entry #75, Ex. #1, attachment.

On August 21, 2007, Governor Mike Beebe set an October 16, 2007 execution date for Jones.  On August 22, 2007, Defendants responded in opposition to Nooner's motion for a stay of execution, and Nooner filed a reply on August 27, 2007.  On September 4, 2007, Jones filed a motion for a stay of execution.  The time for a response to Jones's motion has not expired, and Defendants have not filed a response.

## II.  Arkansas's Lethal Injection Protocol

Since 1983, Arkansas's lethal injection statute has provided that the "punishment of death is to be administered by a continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice."  Ark. Code Ann. § 5-4-617(a)(1).  Arkansas law gives Director Norris the responsibility to determine the substances to be administered and the procedures to be used in any execution.  *See* Ark. Code Ann. § 5-4-617(a)(2).

When Nooner initiated this lawsuit, Arkansas's lethal-injection protocol called for administering three chemicals, each followed by a saline flush, through an intravenous line ("IV") in the following amounts and order: (1) 2-grams of Sodium Pentothal (also known as thiopental), administered to cause unconsciousness; (2) 2, 50-milligram injections of pancuronium bromide, administered to cause paralysis; and (3) up to 3, 50-milliequivalent injections of potassium chloride, administered to stop the heart.[4]  Injections are administered by way of control devices located in a control room, separate from the execution chamber.  The control devices are connected, by extension tubing, to IV catheters inserted into each arm of the

---

[4]*See* docket entry #21, Ex. 1 (ADC Administrative Directive 96-06 dated May 23, 1996, Attachment C–Lethal Injection Procedure).

condemned inmate.  The catheters are inserted by an IV team, and the injections are administered

by executioners, whose identities are kept secret.  The original protocol, as written,  contained no

provision requiring that  the IV team or other personnel involved in the execution process have

any type of medical training or certification.

On July 16, 2007, Norris amended the written protocol.  By declaration, Norris testifies

as follows:

> On or about June 26, 2007, and July 12, 2007, I consulted with Mark Dershwitz,
> M.D., Ph.D. to determine what changes, if any, to Arkansas's lethal injection
> protocol would further reduce what I considered to be the already minimal possibility
> that a condemned inmate would experience unnecessary pain during an execution in
> the future. Based on those consultations with Dr. Dershwitz, my own previous
> observations of lethal injection executions, and discussions that I have had over the
> years with other correctional professionals concerning lethal injection executions,
> I amended the ADC's lethal injection protocol on July 16, 2007.

Docket entry #74, Ex. #1

The amended protocol, like the original, makes the ADC Deputy Director for Health and

Correctional Programs ("Deputy Director") or her designee responsible for carrying out or

supervising many of the activities included in the execution procedure.  The protocol states:

"Unless otherwise stated, the Deputy Director, or the designee, shall be healthcare trained,

educated, and/or experienced in matters related to the establishment and monitoring of IVs, the

mixing and administration of lethal chemicals, and assessing the presence or absence of

consciousness."  Docket entry #74, Ex. #2 (Lethal Injection Procedure, Section I.1.).

The amended protocol provides that the Deputy Director or her designee "shall verify as

to type and concentration, and thereafter supervise the mixing or reconstituting of the [lethal-

injection] chemicals in such a manner as will meet lethal injection requirements [set forth in

Section IV]." *Id.*   The mixed chemicals are transferred to appropriate syringes, which are

placed in lethal injection drug box, which is "secured."  The protocol provides that the Deputy

Director or her designee "shall maintain personal, physical custody of the lethal injection drug

box and physically convey the box to the Cummins Unit for secure storage in the institutional

vault until such time as it is delivered to the execution chamber for use." *Id.* (Section I.3.)

The protocol, in Section IV., identifies the contents of the lethal injection drug box and

the administration sequence and chemical makeup of each lethal chemical used as follows:

| SYRINGE LABELED/ MARKED | CONTENTS |
|---|---|
| #1/#2 | Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc) |
| #3/#6 | Normal Saline, 50 cc each |
| #4/#5 | Pancuronium Bromide, 100 mg (two (2) syringes of 50 mg in 50 cc) |
| #7/#8 | Potassium Chloride,  240 mEq (two (2) syringes of 120 mEq in 60 cc) |
| Back up syringes: | |
| #B1/B2 | Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc) |
| #B3 | Normal Saline, 50 cc |

Pursuant to the protocol, on the eve of execution, the executioners enter the injection

room and inventory the lethal injection drug box to ensure that all lethal chemicals are accounted

for.  The protocol provides that "if needed," prior to the day of execution, the Deputy Director or

her designee will orient the executioners to the ADC's lethal injection procedure.  *See id.*

(Section I.4.).

6

Before the IV team initiates IV lines, the Deputy Director or her designee affixes cardiac monitor leads to the condemned inmate at standard 3-lead positions.  Additionally, the execution gurney is positioned in the death chamber in a manner that allows  the Deputy Director or her designee and the executioners to directly observe the condemned inmate's face and IV infusion sites.

Section II. of the amended protocol covers the IV set-up procedure and provides that the Deputy Director or her designee shall have the IV team place a catheter in each arm of the condemned inmate or "other standard  anatomical venous point of entry."   The protocol requires that the IV team "be healthcare providers who are qualified by training or credentials such as an emergency medical technician, nurse, or physician to initiate IV lines." *Id*. (Section II.1.).

After the insertion of peripheral catheters, an IV administration set is inserted into the outlet of a bag of D5NS (dextrose 5 percent normal saline) solution.  Two set-ups are prepared in this manner.  Next, tubing is connected to the receiving port of two, three-way control devices. The tubing is then connected to discharge ports on the control devices and to the IV insertion sites.  The tubing is then cleared of air and made ready for use.

Next, infusion of the D5NS solution begins at a slow rate.  The amended protocol requires that the Deputy Director or her designee "shall ensure that the cardiac monitor is 'on' and functioning [and shall] properly and maintain observation of IV infusion(s) to ensure that the rate of flow is uninterrupted." *Id*. (Section II.7.)  The amended protocol mandates that after the IV set up is complete, "NO FURTHER ACTION shall be taken until the prearranged signal to start the injection of lethal chemicals is given by the Warden." *Id*.

In the event that a patent IV site cannot be established, the amended protocol requires the

7

following action:

> The IV Team shall be directed by the Deputy Director, or designee, to evaluate other possible infusion sites. All effort will be made to establish two (2) unrelated intravenous infusion sites. If one (1) patent infusion site is established, and a second site proves to be a futile effort, the Deputy Director, or designee, may direct the IV Team to suspend further action. In the case that no patent infusion site is established after reasonable attempts as determined by the IV Team, the Deputy Director, or designee will direct the IV Team to suspend further action and thereafter summon trained, educated, and experienced person(s) necessary to establish a
> primary IV line as a peripheral line or as a central venous line.

*Id.* (Section II.8.)

The amended protocol contains the following language:

> EVERY EFFORT WILL BE EXTENDED TO THE CONDEMNED INMATE TO ENSURE THAT NO UNNECESSARY PAIN OR SUFFERING IS INFLICTED BY THE IV PROCEDURE. STANDARD PRACTICE OF USING A LOCAL ANESTHETIC WILL BE ACCOMMODATED AS NECESSARY.

Section III. of the protocol covers the injection procedure and provides that  3-way control devices facilitate the movement of fluid from the IV solution bag and allow introduction of lethal chemical. A valve directs which fluid source enters the IV set up.

Under the amended procedure, when the signal to commence is given by the Warden, the executioners administer the lethal chemicals under the direction of the Deputy Director or her designee as follows:

> a.   Syringe #1 (containing Sodium Pentothal) shall be inserted into the designated receiving port of the three-way control device.
>
> b. The flow of IV solution will be interrupted by moving the three-way valve assembly towards the IV solution receiving port.
>
> c. The contents of Syringe #1 shall commence with a steady even flow of the lethal chemical. Only a minimum amount of force will be applied to the syringe plunger.
>
> d. When the contents of Syringe #1 have been injected, the three-way valve assembly will be moved so as to shut off the infusion of lethal chemical and

8

resume infusion of IV solution.

e. Syringe #1 will be replaced by Syringe #2 and the procedure described in subparagraphs a-d for Syringe #1 will be repeated. This process will be repeated for all subsequent syringes.

Following the administration of the first three syringes (2 injections of 1.5 grams of Sodium Pentothal, followed by a saline flush) the Deputy Director or her designee, "will assess and monitor the condemned inmate's lack of consciousness by using standard procedures as taught in basic life support or CPR courses, such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli." *Id*. (Section III.f.).

Once the Deputy Director or her designee determines that the condemned inmate is unconscious, and at least three  minutes have elapsed from starting Syringe #1, all remaining chemicals will be administered to the unconscious inmate in numerical sequence; Syringe #4 through Syringe #8.

The protocol provides that if the Deputy Director determines that the condemned inmate remains conscious following the administration of Syringe #3, the back-up syringes of Sodium Pentothal and a repeat normal saline wash shall be administered into the secondary or alternative IV line. *Id*.  Thereafter, once the Deputy Director or her designee determines that the condemned inmate is unconscious, and at least three minutes have elapsed from starting Syringe #B1, all remaining chemicals will be administered to the unconscious inmate in numerical sequence into the secondary or alternative IV line; Syringe #4 through Syringe #8.  *Id*.

The protocol requires that a cardiac monitor be used to display heart function. *Id*.(Section III.h.).  When all lethal chemical syringes have been administered, and a flat-line is observed for a minimum of three to five,  three-second sweeps on the cardiac monitor, the Coroner shall be

summoned for purpose of pronouncing death.  *Id*.

Throughout the infusion process, the Deputy Director or her designee "will closely monitor the infusion site for evidence of infiltrate, vein collapse, or other challenge to the patency of the infusion site." *Id*. (Section III.i.).   If a problem is suspected, the Deputy Director or her designee will "direct reduction of lethal chemical flow rate or redirect chemical to secondary site." *Id*. (Section III.i.1.).  The protocol requires the following actions when a single IV site is suspected to be compromised: First, the chemical flow rate will be reduced.   If problem persists, the administration procedure will be ceased; the curtain to death chamber will be closed;  the IV Team will be summoned, and infusion site problem corrected.  *Id*. (Section III.i.2.).

If all efforts to re-establish a patent IV site fail, the Deputy Director or her designee will direct the IV team to suspend further action and a  "trained, educated, and experienced person [or persons]"  necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site.  When the infusion compromise is corrected, the IV team and the summoned person(s) will be excused, the curtain reopened, and the lethal injection procedure continued.

### III.  Plaintiffs' Claims

Plaintiffs claim that the amended protocol subjects them to a constitutionally significant risk that they will suffer excruciating pain upon administration of potassium chloride, and they will be  unable to demonstrate their suffering because of the paralyzing effect of pancuronium bromide.  It is undisputed that a condemned inmate would experience severe pain if potassium chloride were administered without adequate anesthetization.

Plaintiffs' medical expert,  Mark J. S. Heath, an anesthesiologist, acknowledges that two grams of sodium thiopental (1 gram less than the dose mandated by the ADC's protocol) if properly administered into the bloodstream, "would be more than sufficient to cause unconsciousness and, eventually, death, if no resuscitation efforts were made . . . ."  Docket entry #21, Ex. #7, ¶ 26.   However, Dr. Health states that his research "strongly indicates that executions have occurred where the full dose of sodium thiopental listed in the protocol was not fully and properly administered."  *Id*.  Dr. Heath states: "If an inmate does not receive the full dose of sodium thiopental because of errors or problems in administering the drug, the inmate might not be rendered unconscious and unable to feel pain, or alternatively might, because of the short-acting nature of sodium thiopental, regain consciousness during the execution."  *Id.*

### IV.  Nooner's Motion for a Stay of Execution

Nooner is not entitled to a stay of execution as a matter of course.  He bears the burden to satisfy all the requirements for a stay, including a showing of a significant possibility of success on the merits.  *See Hill v. McDonough,* 126 S. Ct. 2096, 2104 (2006).  The factors to consider when deciding whether to grant or deny a motion for a preliminary injunction include: (1) the threat of irreparable harm to the movant; (2) the state of the balance between the movant's harm and the injury that granting the injunction will inflict on other parties involved in the litigation; (3) the probability the movant will succeed on the merits; and (4) the public interest. *See Dataphase Sys., Inc. v. CL Sys*., 640 F.2d 109, 113 (8th Cir. 1981).  Additionally, a court considering a stay of execution must apply "'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring an entry of a stay.'"  *Hill v. McDonough*, 126 S. Ct. at 2104(quoting

*Nelson v. Campbell,* 124 S. Ct. 2117, 2126 (2004)).

Threat of Irreparable Harm

The threatened harm alleged by Nooner--that he will be inadequately anesthetized and thus suffer intense pain during the lethal injection procedure--if realized, would  be irreparable. However, as explained below, it is unlikely that Nooner can show that the ADC's protocol, as written, presents an inherent substantial risk that he will suffer constitutionally significant pain.

Balance of Potential Harms and Public Interest

Arkansas has a significant interest in meting out a sentence of death in a timely fashion. *See Nelson v. Campbell,* 124 S. Ct. 2117, 2123 (2004)(citations omitted). "Only with an assurance of real finality can the State execute its moral judgment in a case.  Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon v. Thompson*, 118 S. Ct. 1489, 1501 (1998)(citing *Payne v. Tennessee,* 111 S. Ct. 2597 (1991)). To disrupt the expectation of finality by issuing a stay of execution at this point, without the showing of a significant possibility that Nooner will succeed on the merits, would impose severe injury to the "powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Calderon v. Thompson,* 18 S.Ct. at 1501(quoting *Herrera v. Collins,* 113 S.Ct. 853, 871(1993)(O'Connor, J., concurring)).  The Court finds that the balance of harms and the public interest weigh against a stay of execution.

Probability of Success on the Merits

In *Taylor v. Crawford*, 487 F.3d 1072 (8th Cir. 2007),  the Eighth Circuit upheld Missouri's lethal injection protocol and gave clear instruction regarding the correct standard for evaluating an Eighth Amendment challenge to a lethal injection protocol.  The Court emphasized

that the proper focus is not the risk of accident, but "whether the written protocol inherently imposes a constitutionally significant risk of pain." *Taylor*, 487 F.3d at 1080.  The Court stated: "If [a] protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis." *Id*. (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947)).

Missouri's protocol, as described in *Taylor*, uses the same three-chemical sequence as the ADC's protocol, but Missouri requires a 5-gram dose of thiopental.  Although the ADC's protocol calls for only 3 grams of thiopental, Dr. Heath has acknowledged that 2 grams of the chemical, if properly administered, would be more than sufficient to cause unconsciousness.

Defendants submit the declaration of Dr. Mark Dershwitz, an anesthesiologist with a Ph.D. in pharmacology.  Docket entry #74, Ex. #3.  In a case challenging Virginia's lethal injection protocol, Dr. Heath "conceded that with respect to the pharmacokinetics and pharmacodynamics[5] of sodium thiopental, he defers to Dr. Dershwitz's expertise." *Reid v. Johnson,* 333 F. Supp. 2d 543, 547 (E.D. Va., 2004).  Dr. Dershwitz states that he has conducted detailed analysis regarding the time course and effects of a 3 gram dose of thiopental, and in his opinion, "the dose of thiopental sodium used by Arkansas would render most people unconscious within 60 seconds from the time the [first] injection of thiopental sodium begins." *Id*. ¶ 10.  He further states "virtually every person given [3 grams] of thiopental sodium will have stopped breathing prior to the administration of the pancuronium bromide." *Id*.

_____

[5]Dr. Dershwitz states that pharmacokinetics is a branch of pharmacology involving the time course of a drug, while pharmacodynamics refers to the effects of a drug. Docket entry #74, Ex. #3, ¶2.

Missouri's protocol requires that a physician, nurse, or pharmacist prepare the lethal chemicals, which are injected by non-medical department employees.  Nooner contends that Arkansas's protocol is deficient because it assigns the preparation of lethal chemicals to "someone with no medical credentials whatsoever under supervision of someone with no medical credentials whatsoever."  Docket entry #87, at 27.  While the ADC's written protocol does not specify the qualifications of persons who prepare the lethal chemicals, it does require that the person supervising the preparation (the Deputy Director or designee) must be "healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of lethal chemicals, and assessing the presence or absence of consciousness."  Docket entry #74, Ex. #2 (Lethal Injection Procedure, Section I.1.).

The Missouri and Arkansas protocols both require that IV insertions be accomplished by medical personnel–a physician, nurse, or EMT.   Both protocols require confirmation, following administration of thiopental, of the condemned inmate's lack of consciousness.  Both protocols require a three-minute wait, after it is determined that the inmate is unconscious, before the remaining chemicals are administered.  Arkansas's protocol further requires that throughout the infusion process, the Deputy Director or designee closely monitor the infusion site for evidence of problems.  Both protocols provide for back-up syringes of thiopental, to be administered though the secondary or alternative IV line if additional anesthetic is required.  Both protocols provide that if a peripheral IV site cannot be established, a peripheral or central venous primary IV line will be establish by a person with the training, education, and experience necessary for the procedure.

The Eighth Circuit determined that Missouri's protocol "renders any risk of pain far too remote to be constitutionally significant." *Taylor*, 487 F.3d at 1085.   Given the similarity between the Missouri and Arkansas protocols,  the Court finds that the probability that Nooner will succeed on the merits is slight.

Nooner argues that this case is significantly different from the situation in *Taylor* because "Plaintiffs have presented compelling evidence that Defendants have botched executions and failed to implement their protocols humanely in the past."[6]  Nooner argues that the Court must go beyond the four corners of the written protocol because it is a "combination of both the written document and its actual implementation that determines whether he is likely to be subjected to unnecessary and unconstitutional pain and suffering during his execution."

If Nooner is challenging conduct alleged to be a deviation from the official lethal injection protocol, he must show deliberate indifference.  *See Taylor*, 487 F.3d at 1081 ("The conduct challenged in the present case is neither alleged to be accidental nor a deviation from the official procedure, which would require a showing of an intent to harm or deliberate indifference.")  Under the deliberate indifference standard, an inmate must show that a prison official acted or failed to act despite his knowledge of a substantial risk of serious harm to the inmate.  *See Ambrose v. Young*, 474 F.3d 1070, 1076 (8th Cir. 2007)(citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).   Especially in light of the ADC's attempt to improve its protocol

---

[6]*See* docket entry #91, at 4 n.2. The allegedly botched executions include the 1990 execution of Ronald Gene Simmons (the first execution by lethal injection in Arkansas), the 1992 executions of Steven Hill and Rickey Ray Rector, and the 2004 execution of Charles Singleton.  *See* Plaintiff's Statement of Material Facts, docket entry #81, ¶ 6.  Although the record contains no definitive information regarding the number of lethal injection executions that have occurred in Arkansas since 1990, Nooner has indicated that the number is 26.  *See* docket entry #80, at 8.

with recent revisions, it is most unlikely that Nooner can show deliberate indifference.

Unreasonable Delay

In deciding whether Nooner unreasonably delayed his challenge to Arkansas's lethal injection protocol, the proper inquiry "is whether [Nooner] could have brought his claim 'at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Nooner v. Norris*, 491 F.3d 804, 809 (8th Cir. 2007)(quoting *Jones v. Allen*, 485 F.3d 635, 641 (11th Cir. 2007)). "Once a state inmate's sentence of death has become final on direct review in the state's courts, there is no impediment to filing a § 1983 action challenging the constitutionality of a state's lethal injection protocol as long as lethal injection is the established method of execution, the protocol is known, and no state administrative remedies are available." *Id*., 491 F.3d at 808 (citing *Gomez v. U.S. Dist. Court for the N. Dist. of Calif.*, 503 U.S. 653, 653-54 (1992)).

Here, a  review of Nooner's post-conviction litigation shows that direct review of his sentence and conviction in state court was complete in 1996, ten years before he commenced this action.[7]  Lethal injection has been the primary method of execution in Arkansas since 1983. Additionally, as explained in an order entered on June 19, 2006  in this case (docket entry #24), Nooner had no available administrative remedies regarding the lethal injection protocol.  Thus, Nooner was free to challenge the lethal injection protocol immediately after direct review of his

---

[7]On March 16, 1993, Nooner shot and killed Scot Stobaugh.  On September 28, 1993, a jury convicted Nooner of capital-felony murder and returned a sentence of death by lethal injection.  Nooner appealed to the Arkansas Supreme Court, which affirmed his conviction and sentence.  *See Nooner v. State*, 907 S.W.2d 677 (Ark. 1995), *cert. denied*, 517 U.S. 1143 (1996). Nooner then sought post-conviction relief in state court, and the Arkansas Supreme Court affirmed the trial court's denial of post-conviction relief.  *See Nooner v. State*, 4 S.W.3d 497 (Ark. 1999).

conviction and sentence in 1996.

Nooner offers five reasons why the Court should find no unreasonable delay on his part. First, he asserts that Defendants "completely reset the dilatoriness clock" when they revised the lethal injection protocol.  The crux of Nooner's claim is that unless thiopental is correctly administered, he will suffer excruciating pain upon administration of potassium chloride, and he will be unable to demonstrate his suffering because of the paralyzing effect of pancuronium bromide.   Although the ADC revised the lethal injection protocol on July 16, 2007, the revisions did nothing to change the component of the protocol essential to Nooner's claim: the serial administration of thiopental, pancuronium bromide, and potassium chloride.  Nooner failed to challenge the original protocol on a timely basis, and the recent revisions provide no basis for excusing his delay.

Second, Nooner argues that Arkansas's lethal injection procedures have long been "top secret" and "nothing in the record . . . even remotely suggests Mr. Nooner had reason to know of Arkansas's lethal injection procedure before he filed this suit."  Twenty-nine states, and the federal government, use the specific three-chemical protocol at issue in this case, *see Workman v. Bredesen*, 486 F.3d 896, 907 (6th Cir. 2007), and legal challenges to three-chemical protocols, one filed as early as 1995, are numerous.[8]

---

[8]*See Bieghler v. State,* 839 N. E. 2d 691 (Ind. 2005), *cert. denied*, 546 U.S. 1159 (2006); *Boyd v. Beck,* 404 F. Supp. 2d 879 (E.D. N.C. 2005);  *Abdur'Rahman v. Bredesen,* 181 S.W.3d 292 (Tenn. 2005), *cert. denied* , 126 S. Ct. 2288 (2006);  *Aldrich v. Johnson*, 388 F.3d 159 (5th Cir. 2004);  *Reid v. Johnson,* 333 F. Supp. 2d 543 (E.D. Va. 2004); *Harris v. Johnson,* 376 F.3d 414 (5th Cir.2004); *People v. Snow,* 65 P.3d 749 (Cal. 2003), *cert. denied* 540 U.S. 1076 (2003); *Sims v. State,* 754 So. 2d 657 (Fla. 2000), *cert. denied*, 528 U.S. 1183 (2000); *State v. Webb,* 750 A.2d 448 (Conn. 2000), *cert. denied,* 531 U.S. 835 (2000); *LaGrand v. Lewis,* 883 F. Supp. 469, 470-71 (D. Ariz. 1995 )(finding lethal injection constitutional and citing several cases holding likewise), *aff'd,* 133 F.3d 1253 (9th  Cir. 1998), *cert. denied,* 525 U.S. 971 (1998).

The three-chemical protocol has been in use in Arkansas since 1983; the "botched" executions that Plaintiffs cite in support of their claims occurred in 1990, 1992, and 2004; and witness accounts of at least two of the "botched" executions appeared in Arkansas newspaper articles. *See* docket entry #82, Exs. #3, #4. Given these circumstances, the Court finds that Nooner should have been aware of the of the three-chemical protocol and the alleged associated risk of pain long before he filed this lawsuit on May 1, 2006. *See Jones v. Allen*, 485 F.3d 635, 640 n.3 (11th Cir. 2007)(finding that secrecy surrounding Alabama's lethal injection protocol did not excuse inmate's delay as alleged risks involved with three-chemical protocol were known at least three years before inmate filed complaint on November 1, 2006).

Third, Nooner asserts that he brought this lawsuit fifteen months before the State scheduled his execution, and the merits of his claim easily could have been resolved before his September 18, 2007 execution date. Nooner states that his failure to seek discovery while Defendants appealed Davis's stay of execution "is not the type of conduct that constitutes the unnecessary delay in initiating challenge . . . . " Docket entry #91, at 2.

By waiting until May 2006 to file this action, Nooner ran the risk that his execution date would be scheduled before a resolution on the merits, and his lack of diligence in prosecuting his claim after he filed suit increased that risk. The Court finds that Nooner could have brought his claim at such a time as to allow consideration of the merits without requiring entry of a stay, and he failed to do so.

Fourth, Nooner cites *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007), for the proposition that a lethal injection challenge becomes ripe only when a prisoner's execution becomes imminent. The Eighth Circuit has rejected this argument, and this Court is bound to do the same.

18

*See Nooner v. Norris*, 491 F.3d 804, 810 (8th Cir. 2007)("*Panetti* deals with mental competence to be executed, a condition of the mind which may not manifest itself until so late a time that a stay becomes necessary in order to evaluate properly the asserted mental deficiency.  That cannot be said about an execution protocol which, as we have pointed out, has been long known and unchanged in its implementation for years, thereby permitting an evaluation of its constitutionality without the necessity of the issuance, in effect, of an eleventh hour stay.").

Fifth, Nooner argues that even assuming he unnecessarily delayed bringing this action, his delay should be excused by "his longstanding schizophrenia and consequent mental incompetency, which prevented him from being able to assert his rights against Defendants' cruel and unusual execution procedure."[9]

The record contains no evidence of a medically diagnosed psychotic disorder, adjudication of incompetence or incapacity, or any mental defect that would excuse Nooner's delay.  Nooner states that the Eighth Circuit has  "actually adjudged" him incompetent and, consequently, he "remains under a presumption of continuing mental incompetency."  Nooner is mistaken.  On July 30 , 1996,  Nooner, represented by counsel, sought habeas relief in federal court.  *See Nooner v. Norris*, No. 5:96CV00495 GH (E.D. Ark).   While Nooner's habeas petition was pending, he filed a *pro se* motion to dismiss his petition.  The district court rejected Nooner's request, and on appeal, the Eighth Circuit remanded and directed the district court to determine whether Nooner was competent to withdraw his petition.

---

[9]Docket entry #87, at 41.   Nooner, through his attorney, states: "Mr. Nooner's mental illness has prevented him from rationally understanding that his execution will occur and that it will result in his death.  It has prevented him from comprehending that he will die according to the ADC's lethal injection protocol or that the protocol creates a substantial risk that he will be fully conscious and in agonizing pain for the duration of the execution process."  *Id*. at 44.

On remand, the district court heard testimony from mental health experts who examined Nooner and determined that he was competent to withdraw his petition.  Additionally, the district court addressed the merits of Nooner's petition and concluded that his stated claims were without merit.  Nooner, through counsel, appealed the district court's competency determination and dismissal of the petition on the merits. The Eighth Circuit ruled that Nooner's motion to dismiss his petition was not knowing and voluntary; but the Court found *no error* with the district court's finding that Nooner was competent and possessed the ability to understand his request to withdraw his habeas petition.[10]   *See Nooner v. Norris*, 402 F.3d 801, 805-06 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 2037 (2006). Additionally, the Court affirmed rejection of Norris's petition on the merits.

Nooner's habeas litigation continues to this day.  On April 7, 2006, while Nooner's appeal of the district court's competency determination and dismissal on the merits was still pending, Nooner filed a separate habeas petition.  *See Nooner v. Norris*, No. 5:96CV00495 GH, docket entry #83.   In that petition, Nooner charges that ADC policy prohibiting mental health evaluations unless ordered by a court has violated his "fundamental right of meaningful access to the courts, his right to the assistance of counsel and his right to be free from cruel and unusual

---

[10]"The two questions–the competency to waive a right and whether the waiver was knowing and voluntary are distinct . . . ." *O'Rourke v. Endell* , 153 F.3d 560, 567 (8th Cir. 1998). In *Godinez v. Moran,* 509 U.S. 389 (1993), the Supreme Court explained the difference as follows:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.

*Godinez,* 509 U.S. at 401 n.12 (internal citations omitted).

punishment." *Id*., at 1.  By way of relief, Nooner sought an order that would allow him to meet with mental health experts.  The district court denied the petition as successive, and Nooner appealed.

The Eighth Circuit granted a certificate of appealability on the following issues: (1) whether the ADC's refusal to permit Nooner access to experts for the purpose of a mental health evaluation violated the constitution and (2) whether the district court was correct in ruling that the petition was a second or successive petition under 28 U.S.C. § 2244B(b).

On August 24, 2007, the Eighth Circuit issued a decision reversing the district court's dismissal of Nooner's petition as a second or successive application.  The Court held that the statutory bar on second or successive applications does not apply to incompetency claims brought under *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986), or mental retardation claims brought under *Atkins v. Virginia*, 536 U.S. 304 (2002), filed before or after the state has obtained an execution warrant.  *See Nooner v. Norris*, 2007 WL 2403740 (8th Cir., August 24, 2007).  The Court remanded for further proceedings to determine whether the ADC's refusal to allow Nooner access to mental health experts for the purpose of a mental health evaluation violates the Constitution. *Id*.

On August 31, 2007, Nooner filed a motion for a stay of execution in the remanded habeas proceeding.  *See Nooner v. Norris*, 5:96CV00495 JLH (docket entry #112).  In that motion, Nooner argues, among other things, that he is a "severely mentally ill man who is incompetent to be executed under Eighth Amendment standards" and he "may very well be a person with mental retardation and thus ineligible for execution . . . " *Id*. at 1.

On September 10, 2007, United States Chief District Judge J. Leon Holmes entered an

order granting Nooner a preliminary injunction staying his execution.  The order explains that, pursuant to the Eighth Circuit's opinion and judgment, the district court must review the merits of Nooner's claim.  *See Nooner v. Norris*, 5:96CV00495 JHL, docket entry #121.

Even though Nooner's execution has been stayed for the purpose of permitting review of the separate claim pending in his habeas proceeding, the Court finds it necessary to rule on Nooner's motion for a stay filed in this case.  For the reasons previously stated, the Court finds that Nooner is not entitled to a stay of execution for the purpose of pursuing his lethal injection claims.  Should the stay of execution in Nooner's habeas proceeding be dissolved, the Court will deny any request to continue the stay in order that Nooner can pursue his claims in this case.

## V.  Jones's Motion for a Stay of Execution

In support of his motion for a stay of execution, Jones repeats the same arguments asserted by Nooner.[11]  For the reasons previously stated in connection with Nooner's motion for a stay, the Court finds that Jones has failed to satisfy the traditional requirements for a preliminary injunction.  Additionally, the Court finds that, like Nooner, Jones has unreasonably delayed bringing his claim, as direct review of his conviction and sentence in state court was complete in 1997.[12]  Accordingly, Jones's motion for a stay will be denied.

---

[11]Although the time for filing a response to Jones's motion has not expired, and Defendants have not filed a response as of this date, Defendants addressed the arguments now asserted by Jones in their response in opposition to Nooner's motion for a stay.

[12]On April 17, 1996, following a jury trial, Jones was convicted of the capital murder and rape of Mary Phillips, and the attempted capital murder of Lacy Phillips. He was sentenced to death by lethal injection, life imprisonment, and thirty years' imprisonment, respectively, for the crimes.  Jones's convictions and sentences were affirmed on direct appeal, *see Jones v. State*, 947 S.W.2d 339 (Ark.), *cert. denied*, 522 U.S. 1002 (1997), and the denial of his request for postconviction relief was affirmed.  *See Jones v. State*, 8 S.W.3d 482 (Ark. 2000).

## VI.  Conclusion

For the reasons stated, Plaintiff Nooner's motion for a preliminary injunction or stay of execution (docket entry #87) and Plaintiff Jones's motion for a preliminary injunction or stay of execution (docket entry #92) are DENIED.

IT IS SO ORDERED THIS 11TH DAY OF SEPTEMBER, 2007.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

Jones filed a petition for writ of habeas corpus in this Court, which was denied on April 13, 2006.  *See Jones v. Norris*, No. 5:00CV00401 ODS, docket entry #56.  On August 14, 2006, the Eighth Circuit denied Jones's request for a certificate of appealability, and on December 26, 2006, the Supreme Court denied Jones's petition for certiorari.  *See Jones v. Norris* , 127 S.Ct. 587 (2006).